In the
**UNITED STATES DISTRICT COURT**
for the **SOUTHERN DISTRICT OF INDIANA**,
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **KEVIN D. LONG**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| *vs*. | ) CAUSE NO. 1:08-cv-0890-SEB-TAB |
| | ) |
| **FRANKLIN COMMUNITY SCHOOL** | ) |
| **CORPORATION**, | ) |
| | ) |
| Defendant. | ) |

**Entry on Defendant's Renewed Motion for Summary Judgment (dkt. nos. 31 and 61)**

Kevin Long, a former student at Franklin Community High School, brought this action against the high school, certain school administrators, and the Franklin Community School Corporation ("FCSC") pursuant to 42 U.S.C. § 1983, alleging that the manner in which a urinalysis test was administered to him while he was a student violated his rights under the Fourth and Fourteenth Amendments to United States Constitution. Summary judgment was granted in favor of the high school (it is not a separately suable entity) and its administrators (they enjoy qualified immunity) but was denied as to the District, the one remaining defendant. The parties have now re-briefed FCSC's motion for summary judgment asserting the state of Indiana's immunity from suit pursuant to the Eleventh Amendment to the United States Constitution.

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

1

The issue presented by FCSC's motion is whether it may assert Indiana's Eleventh Amendment sovereign immunity against Mr. Long's § 1983 claim for damages. The Eleventh Amendment renders states immune from suit brought by their own citizens or citizens of other states. The immunity extends to state agencies and state officials sued in their official capacities, *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974), but not to political subdivisions such as counties, cities, and similar municipal corporations, *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 280 (1977). Exceptions have been recognized. First, a state may consent to suit in federal court. Second, Congress may abrogate the states' immunity when it does so expressly and unequivocally and pursuant to a valid grant of constitutional authority. *Tennessee v. Lane*, 541 U.S. 509, 517 (2004). Third, states may be sued for prospective, injunctive relief against ongoing federal violations. *Ex parte Young*, 209 U.S. 123, 159-60 (1908). The school district has not consented to this suit, Indiana has not generally consented to suit under § 1983, *see* Ind. Code Ann. 34-13-4-3 (Burns 2010), Congress did not abrogate states' Eleventh Amendment immunity when it enacted § 1983, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and Mr. Long does not seek prospective, injunctive relief from an ongoing federal violation by the school district. Political subdivisions of states are not immune from § 1983 claims for damages. *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658 (1978).

Therefore, whether FCSC is immune depends on whether it is an arm of the state for Eleventh Amendment purposes and that determination is governed by a two-part standard. "The most important factor is the extent of the entity's financial autonomy from the state;" in other words, whether a judgment against the entity would impact the state's treasury. *Kashani v.*

*Purdue University*, 813 F.2d 843, 845, *cert. denied*, 484 U.S. 846 (1987). The second part is an inquiry into the "general legal status" of the entity. *Id.*, at 846; *Burrus v. State Lottery Commission of Indiana*, 546 F.3d 417, 420 (7th Cir. 2008). The parties dispute both prongs of this standard.

We begin our analysis with a caution. It is well-established that district-court decisions do not have precedential authority in any court, *Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 573 (7th Cir. 2009); *United States v. Articles of Drug Consisting of 203 Paper Bags*, 818 F.2d 569, 572 (7th Cir. 1987), and it is well to emphasize this doctrine in the present case. The issue of Indiana school corporations' Eleventh-Amendment immunity is a novel one in the present context of Indiana's recent significant amendments to its complex statutory and regulatory scheme governing the financial structure of its local schools corporations and the level of state control and oversight over the decisions and activities of those school corporations, and Indiana courts have yet to address this new legal environment. Federal courts tread especially carefully in such cases. In addition, the parties' briefs, focusing naturally on their own individual interests, have not comprehensively addressed all of the relevant aspects of the issues that would be necessary to support a generally applicable or particularly persuasive holding that would be of use to other parties and in other circumstances. Neither the state's, other school corporations', or potential plaintiffs' positions were presented. Finally, in this context of sensitive federal-state relationships that implicates novel and complex questions of state law, the Court is most inclined to strictly adhere to the "party presentation rule" and resolve the motion before it based solely on the issues and arguments presented by the parties. *Burlington Northern and Santa Fe Ry. Co. v. United States*, 129 S.Ct. 1870, 1885-86 (U.S. 2009); *Greenlaw v. United States*, 554 U.S. 237,

128 S.Ct. 2559, 2564 (U.S. 2008).[1] Therefore, we emphasize that the present Entry resolves only the issues as presented by the parties in this case and based solely on the arguments presented by them. And it resolves these issues and arguments only as between the parties in this case. This Entry should not be construed as, or argued to be, an authoritative holding of this court that reaches beyond the issues presented. Its precedential effect, even in this Court, is nil and its persuasive effect, if any, should be and is intended to be strictly limited to the circumstances and arguments presented in this case.

**Financial autonomy**

The factors which a court reviews to inform its evaluation of the first prong of the Eleventh Amendment analysis — an entity's financial autonomy from the state — include: "(1) the extent of state funding; (2) the state's oversight and control of the entity's fiscal affairs; (3) the entity's ability to raise funds; (4) whether the entity is subject to state taxation; and (5)

---

[1] "In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present. To the extent courts have approved departures from the party presentation principle in criminal cases, the justification has usually been to protect a pro se litigant's rights. But as a general rule, '[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.' As cogently explained:

> "[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties. Counsel almost always know a great deal more about their cases than we do, and this must be particularly true of counsel for the United States, the richest, most powerful, and best represented litigant to appear before us."

*Greenlaw*, 128 S.Ct. at 2564 (citations and footnotes omitted).

whether a judgment against the entity would result in an increase in its appropriations [from the state]." *Peirick v. IUPUI Athletics Dept.*, 510 F.3d 681, 696 (7th Cir. 2007).

Applications of this analysis, yielding different results, are represented by the Seventh Circuit's *Kashani* and *Burrus* decisions, *supra*. In *Kashani*, the Court held that Purdue University, a state university in Indiana, partook of the state's Eleventh Amendment immunity from the plaintiff's § 1983 damages suit alleging national-origin discrimination in violation of the Equal Protection Clause of the United States Constitution.[2] Regarding the first factor, the extent of state financing, the Court found that Purdue received approximately one third of its income from the state, other sources being "auxiliary enterprises (17%); student fees (16%); gifts, grants, and contracts (13%); sales and services (7%); student aid (4%); federal appropriations (3%); organized activities (2%); endowment income (.1%)." *Kashani*, 813 F.2d at 845.

On the second factor, the state's oversight and control of the entity's fiscal affairs, the Court concluded that the state carefully examines the university's finances in deciding on its appropriations. Purdue was required to file detailed reports of the previous budget year's expenditures (including the payment of judgments) and its expected expenditures for the next budget year with explanations showing reasons for increases and decreases. The state's budget agency could require additional information, hold hearings, and submit recommendations to the state legislature. Indiana's Commission for Higher Education was also authorized to review

---

[2] The Court also found that defendant university officials, sued in their official capacities, were immune from the plaintiff's claim for damages but were not immune from his claim for injunctive relief.

Purdue's budget requests and make recommendations thereon to the governor, legislature, and the state's budget agency.

With respect to the third factor, the entity's ability to raise funds, the Court distinguished the ability to raise funds through taxation and through borrowing. It held that "[t]he absence of the power to tax is a strong indication that an entity is more like an arm of the state than like a county or city, because that enablement gives an entity an important kind of independence. The absence of that authority, for an entity like Purdue, ensures ultimate fiscal reliance upon the state." *Kashani*, 813 F.2d at 846. Although it had found that Purdue received only one-third of its funds from the state, and "ha[d] sources of revenue other than appropriations from the legislature," *id*., the inability to raise funds through taxation was decisive. It found that Purdue could raise money "only by entering into one of the various markets: the market for bonds [borrow], for higher education [increase tuition], for services [selling the university services], and so forth." *Id*. Such non-coercive means of raising money do not indicate that an entity is a state agency. *Kashani*, 813 F.2d at 846.[3]

The Court found that the fourth factor — whether the entity is subject to state taxation — had less force because, while the state exempted Purdue from taxation, it also exempted political

---

[3] "Purdue has no power to levy taxes. So although Purdue has sources of revenue other than appropriations from the legislature, it lacks the ability that cities and counties typically have to require payments in the form of taxation. It can raise money only by entering into one of various markets: the market for bonds, for higher education, for services, and so forth. Paying a judgment in a case like the present is also not one of the purposes for which Purdue is authorized to issue bonds. The absence of the power to tax is a strong indication that an entity is more like an arm of the state than like a county or city, because that enablement gives an entity an important kind of independence. The absence of that authority, for an entity like Purdue, ensures ultimate fiscal reliance upon the state." *Kashani*, 813 F.2d at 846.

subdivisions, such as counties and municipalities, which are not state agencies.

The Court's treatment of the final factor — whether a judgment against the entity would result in an increase in state appropriations — built on the result of the other factors. Because Purdue is, by design, dependent on state appropriations that are "carefully geared," through the state's close oversight and control of Purdue's expenditures and budgets, in order to meet its changing needs, "it is apparent that the payment would directly affect the state treasury." *Id*. "Indiana has not created an entity with a separate financial basis; it has created one that is dependent upon and functionally integrated with the state treasury." *Id*. Although the state would not issue any judgment payment, it was clear that the state would account for any judgment in its appropriations to Purdue. The extent of Purdue's financial autonomy "strongly indicate[d]" that Purdue was a state entity and, therefore, enjoyed Eleventh Amendment immunity from suit.

In *Burrus*, the Seventh Circuit came to the opposite conclusion regarding the State Lottery Commission of Indiana ("Lottery"). Except for an initial start-up appropriation of six million dollars to establish the Lottery in 1989 (which it quickly paid back), the state has appropriated no funds for the Lottery, which has been self-sufficient since that time. In fact, the Lottery has generated significant profits which it regularly transfers to the state to fund other programs. Any monetary settlements or other legal obligations paid by the Lottery come from its own administrative trust fund and, according to the Indiana Attorney General, the state would not be liable for any financial defaults by the Lottery. The Seventh Circuit found that, because the Lottery was not dependent on state funds for any of its operations and a judgment against the

7

Lottery would not "expose state coffers," the Lottery was entirely financially independent of the state.

In the public-schools context of this case, Indiana has moved from a system of financing school corporations primarily through local property taxes that were levied largely in the discretion of local school corporations, with some state supplementation, to the current system where the overwhelming majority of school corporations' operating revenues are provided by the state (from state-wide sales-tax collections) and school corporations' remaining authority to levy property taxes is both capped and limited to certain uses. The trend clearly has been toward greater state funding and oversight of local school corporations. FCSC argues that this greater state role means that it is not financially autonomous from the state and that *Kashani* controls. Plaintiff responds that, while FCSC is not financially independent as was the Lottery in *Burrus*, it has funds other than those provided by the state from which to satisfy any judgment in this case.

Indiana statutes provide a non-exhaustive list of fourteen funds from which school corporations may draw to carry out school purposes. Ind. Code 20-40-1-1, *et seq*. Some of these funds are required to be established in all cases, some must be established under certain conditions, and some may be established at the discretion of a school corporation. Every school corporation is required to establish a General Fund, which is the primary source for paying most of a school corporation's operating expenses, including salaries and benefits for teachers, supplies, and utilities. The General Fund also may be used to pay other lawful school expenses that are payable from any other fund unless otherwise prohibited by other law. Certain of the

8

other funds are funded through transfers from the General Fund. After the Indiana General Assembly enacted Public Law 146 in 2008, state sales-tax distributions have replaced local property taxes as the source of General Fund revenue. However, local property taxes continue to fund some school-corporation funds. For example, school corporations retain the authority to impose a Racial Balance Levy, a School Transportation Levy, a School Bus Replacement Levy, a Capital Projects Levy, and a Debt Service Levy for the purposes defined by statute for these funds. Ind. Code 20-46-1-1, *et seq*.

FCSC asserts that, for 2010, over 98% of its General Fund revenues of $31,010,000 came from the state and that these revenues provided over 95% of FCSC's total operating revenue. Mercer Affidavit (dkt. 73-1) ¶ 5. The other funds that FCSC is required by state law to maintain are the Debt Service Fund, Capital Projects Fund, School Transportation Fund, and the School Bus Replacement Fund.[4] *Id.*[5] While FCSC asserted that the General Fund is "the largest fund

---

[4] The other funds provided by state statute are: Referendum Tax Levy Fund (required if a tax levy referendum is approved in a school district), Special Education Preschool Fund (required if the state appropriates funds for preschool special education), Racial Balance Fund (if the school corporation imposes a Racial Balance Levy), Levy Excess Fund (if the school corporation's property-tax levy actually collected exceeds the total levy approved), Repair and Replacement Fund (an optional fund funded by transfers from the Capital Projects Fund or the General Fund), Self Insurance Fund (an optional fund to pay for an employee health-insurance plan; judgments and settlements against the school corporation, officers, and employees; and insurance plan premiums, and funded by transfers from the General Fund and/or the Capital Projects Fund), Petty Cash Fund (an optional fund funded by transfers from the General Fund), special purpose funds without local tax (optional funds to hold gifts, grants, and endowments given for special purposes and without local tax involvement; establishment of a particular fund might be required by federal or state law); and School Technology Fund (required if money is transferred from the General Fund or received by special-purpose gift for specified technology purposes).

[5] FCSC's Chief Financial Officer averred only that the state requires FCSC to maintain these five funds. Mercer Affidavit § 5. He did not state whether the FCSC maintained any other

maintained by [FCSC] for its operations," *id*. ¶ 6, it did not provide any details about the actual or relative amounts in its funds.

**Extent of state funding.**  FCSC argues that the effect of Indiana's recent restructuring of school financing means that schools now are almost entirely dependent on state funding and, therefore, under *Kashani*, they should benefit from the state's Eleventh Amendment immunity. It argues that the first of the five financial-autonomy factors — the extent of state financing — is satisfied because 100% of school corporations' General Funds are state supported and most of the other funds are state supported. (Brief in Support (dkt. 61) at 11).  In response, Plaintiff maintains only that schools still retain property-tax levies as a source of funds that is independent of the state, (Response (dkt. 72) at 6), but, in any case, the existence of "significant" state support to schools is not dispositive and the other factors must be considered, (*id*., citing *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 280 (1977)).

While it is true that state distributions now supply virtually all of a school corporation's General Fund (as noted, FCSC asserts that 98% of its General Fund is state-provided), FCSC did not show or assert which of the other funds are state supported, to what degree, and what percentage of its entire budget is funded by the state.  As noted above, school corporations still independently collect local property taxes through levies such as the Capital Projects Levy, the Debt Service Levy, and the School Transportation and Bus Replacement Levies to support their

---

optional funds.

respective funds.[6] In addition, while it is evidently true that school corporations' General Funds are now virtually entirely funded by the state, and FCSC asserts that the General Fund accounts for 95% of its total operating revenue, FCSC did not show or assert how much of its budget or balance sheet is comprised of the General Fund and/or other operating revenue.[7] But Plaintiff did not dispute FCSC's assertions and arguments. He, like FCSC, did not explain or suggest how much revenue FCSC raises through its property-tax levies or what percentage of its overall budget is accounted for by state-supplied funds *versus* locally raised funds. In short, neither party compared FCSC's financial circumstances *vis-a-vis* state support to Purdue's circumstances in *Kashani* (30% state support) that the Seventh Circuit found controlling in its decision that Purdue is an arm of the state for Eleventh Amendment purposes. However, because we find that it is common knowledge that a school corporation's operating revenue and expenses are the largest component of its budget, we conclude that this factor weighs in FCSC's favor.[8]

---

[6] FCSC's assertion that "most of the other funds are state supported" is ambiguous. If it means that a majority of the non-General Fund funds receive state money, then the assertion is uninteresting because the first analytical factor examines the *extent* of state funding of an entity as a percentage of its budget, not how many components of the entity's budget receive any amount of state funding. On the other hand, if FCSC's assertion means that a majority of the money in the other (non-General Fund) funds is supplied by the state, then FCSC provided no evidence or citation to support that assertion and it seems to be at odds with the fact that school corporations still collect property taxes for, *inter alia*, capital projects, school transportation, and debt service.

[7] The FCSC's Chief Financial Officer averred only that "the General Fund is the largest fund maintained by [FCSC] for its operation." Mercer Aff. ¶ 6. Neither his affidavit nor FCSC's briefs defined what is meant by operations, specifically whether the term includes certain expenditures made from any of the other funds (*e.g.*, school transportation expenses, training expenses, and property maintenance services).

[8] The Court notes that FCSC's recent report of its calendar-year 2009 budget and receipts shows total budgeted receipts of $50,584,751, of which approximately 61% is composed of

**State's oversight and control of FCSC's fiscal affairs.** Addressing the second factor — the state's oversight and control of FCSC's fiscal affairs — FCSC asserts that, to the extent that it has locally raised funds (*e.g.*, Capital Projects and Debt Service Funds), the state has assumed "almost complete oversight and control over such funds through the Department of Local Government Finance ("DLGF")," (Brief at 11), and "the State exercises almost complete control over local school fund-raising and spending thus meeting the 'oversight and control' prong of the *Kashani* test," (*id*. at 12). In support of these assertions, FCSC quotes and cites statements from DLGF's website — not applicable statutes, regulations, or decisional law — to the effect that DLGF is "responsible for ensuring that property tax assessment and local government budgeting are carried out in accordance with Indiana law," that it approves tax rates and levies of all political subdivisions, and that it reviews and approves all school budgets and local assessments. (Brief at 11-12). None of these statements indicates whether DLGF's review-and-approval authority is substantive or only formal and procedural — in other words, whether DLGF's review only assures that budgets, rates, and levies of school corporations are in compliance with uniform requirements of state law, see *DeHarder Investment Corp. v. Indiana Housing Finance Authority*, 909 F.Supp. 606, 612 (S.D. Ind. 1995),[9] or whether it reviews *de*

---

General-Fund receipts, 99% of which are supplied by the state. (See http://www.challengernewspapers.com/legals/2010%20Franklin%20Schools%20Annual%20Report.pdf, (last visited Sept. 16, 2010)). FCSC's notice of estimated budget for 2011 shows estimated revenue of $49,674,181, 60% of which is General Fund revenue and 40% is estimated to be levy revenue. (See http://www.challengernewspapers.com/legals/ 2010%20Franklin%20Schools%20Budget.pdf (last visited Sept. 16, 2010)).

[9] "True, as defendants correctly observe, the [Indiana Housing Finance Authority] is subject to the oversight of the State Board of Accounts. That 'oversight,' however, consists of little more than making the authority subject to a uniform system of accounting that is prescribed for use by every public office, including municipalities and other political subdivisions not

12

*novo* the business judgments, policy decisions, and educational priorities of school corporations that are incorporated into their proposed budgets, rates, and levies.  However, another quote from DLGF's website clearly indicates that DLGF reviews and approves the substance of school corporations' school-construction proposals "to ensure fiscal responsibility" and "to ensure that Hoosier tax dollars are spent wisely." (*Id*. at 12).  According to its website, DLGF reviews the justifications for school corporations' building plans, the degree of community support, the corporation's graduation rate, ISTEP+ scores, and cost-cutting steps as well as the specific components of the construction proposals, such as the amount of non-traditional classroom space.  FCSC did not cite to any such statements regarding the nature of DLGF's review of school corporations financial affairs, such as budgets, levies, rates, or borrowing.

Plaintiff responds that FCSC has offered little evidence relating to the State's oversight of its own or other school corporations' funds.  He admits that the state exercises "some oversight" of school funds, but asserts that "the State exercises little control over the actual use of these funds." (Response at 7).  The only support that he offers for this assertion is that, under Ind. Code 20-40-2-4 and 20-4-3, the General Fund and the Referendum Tax Levy Fund may be used generally, for any lawful expenses payable from another fund.

Neither side has adequately described the nature of the state's oversight of FCSC's financial affairs.  At most, FCSC showed that DLGF might have substantive oversight and control of capital construction projects, but FCSC's showing relied only on DLGF's self-description on its website, not law, and, at any rate, capital projects is only one part of DLGF's

---

entitled to eleventh amendment immunity." *DeHarder*, 909 F.Supp. at 612.

activities and not terribly relevant to determining FCSC's overall financial autonomy from the state. Because FCSC had the burden on its motion, the Court finds that this factor weighs against FCSC being financially dependent on the state.

**FCSC's ability to raise funds.** FCSC asserts that this third factor also shows its financial dependence on the state. It makes two arguments. First, it contends that a local school corporation's ability independently to raise funds was effectively eliminated by the Indiana Supreme Court's decision in *Nagy v. Evansville-Vanderburgh School Corporation*, 844 N.E.2d 481 (Ind. 2006), wherein it held that school corporations may not impose additional fees on students beyond the state dollars it receives. Second, it asserts that its limited ability to raise funds in the two areas of construction and transportation only is highly regulated by the state. (Brief at 12). Plaintiff did not offer a response.

*Nagy*'s holding is much more limited than FCSC describes. In *Nagy*, the Indiana Supreme Court held that a school corporation's imposition of a uniform $20 activity fee on all students violated the Indiana constitution's mandate that tuition in the public schools shall be without charge, Ind. Const. Art. 8, § 1. The Court held that schools may charge fees only for extra-curricular activities, meaning those activities, projects, services, or curricula that have not been determined, by legislation or administrative rule, to constitute part of a uniform system of public education. *Nagy* did not address a school corporation's ability to raise funds through levies, borrowing, or any other non-student charge. Moreover, as described above, school corporations in Indiana do, in fact, raise revenues independently of state support through their retained Capital Projects, Debt Service, and other levies, not only for construction or

14

transportation purposes as FCSC contends.  Finally, FCSC did not suggest, specify, or support with authority how its ability to raise funds for construction and transportation purposes — or for any other purpose through its other levies — is highly regulated or the nature of that regulation.

While the parties' showings on this factor are deficient, their arguments and showings in relation to the fifth factor, below, is relevant here as well.  In short, and as more fully discussed below, Plaintiff argues that FCSC can raise additional revenue, independently of the state, through two means:  the establishment of a Referendum Tax Levy and increasing its Debt Service Levy.[10]  For the reasons discussed below, the Court finds that both of these means are unavailable to FCSC.   Therefore, the Court concludes that this factor weighs against finding that FCSC is financially independent of the state.

**State taxation.**  FCSC did not address this fourth factor and Plaintiff concedes that, as *Kashani* recognized, exemption from state taxation is a neutral factor in Indiana because the state also exempts counties, cities, and political subdivisions that are indisputably not arms of the state.

**Whether a judgment would result in increased state appropriations.**  Finally, FCSC briefly argues that a money judgment against it would result in an increase in appropriations from the state because any such judgment must be paid from its General Fund, which consists of state money and which must be replaced by the state in order to maintain the level of education that is mandated by law.  The key here is FCSC's assertion that satisfaction of any judgment can

---

[10] Plaintiff did not mention the Self-Insurance Fund.

15

be paid from only the General Fund; but, in its opening brief, FCSC did not explain why a judgment could not be paid from another fund, *e.g.*, its Debt Service Fund, Ind. Code Ann. 20-40-9-6(5).[11] In response, Plaintiff argues that payment of a judgment can come from a Referendum Tax Levy Fund or from FCSC's Debt Service Fund. He points to the fact that revenues raised from a Referendum Tax Levy may be used for any lawful school expense, including judgments. Ind. Code 20-40-3-5. And, if not paid from a Referendum Tax Levy and Fund, then a judgment can be paid through the Debt Service Fund by increasing the Debt Service Levy to fund a judgment debt or to fund the repayment of bonds issued to raise revenue to pay a judgment, Ind. Code 20-48-1-1(b)(2). (Response at 9-10). In reply, FCSC contends that (1) a Referendum Tax Levy is designed for future, not past, expenses and voter approval of a levy is uncertain; and (2) the Debt Service Fund and Levy are unavailable to satisfy a judgment because FCSC is already at the maximum levy allowed by law and its Debt Service Fund is fully committed to service existing obligations.

Plaintiff did not dispute the fact that, if a judgment in this case, by law or practicality, must be paid from FCSC's General Fund, then the result would be an increase in state appropriations to FCSC in order to make up the shortfall, which would be, in effect, a judgment against the state treasury. The state's distributions to school corporations' General Funds are calculated according to a pre-determined formula that has been designed to supply the operational revenue that the state considers necessary to provide the necessary education in each

---

[11] See also, Ind. Code 20-40-12-5 (permitted purposes for a Self-Insurance Fund). The Self-Insurance Fund is funded by transfers from the General Fund (or the Capital Projects Fund to the extent that that Fund may be used for property or casualty insurance). FCSC did not state whether it has established a Self-Insurance Fund.

16

school district, considering the number of students in the district and its demographic profile. See (Brief at 8-9). This formula does not account for judgments against corporations. Therefore, the state would need to make up any losses in school corporations' General Funds as a result of judgments in order to maintain the level of funding required for corporations to meet the state's educational mandates.[12]  *See*, *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 50, 115 S.Ct. 394, 405 (1994) ("'[W]here an agency is so structured that, as a practical matter, if the agency is to survive, a judgment must expend itself against state treasuries, common sense and the rationale of the eleventh amendment require that sovereign immunity attach to the agency.'"). Therefore, the issue relevant to this factor is whether FCSC can satisfy a judgment in this case from any other fund.

FCSC does not have a Referendum Tax Levy Fund because a Referendum Tax Levy has not been sought by the corporation or approved by the district's voters. The Court agrees with FCSC that the time and expense involved in seeking a Referendum Tax Levy and the uncertainty in obtaining its approval in a referendum renders this avenue too remote a source of funds to consider in this analysis. In addition, while Plaintiff is correct that judgments may be paid or funded through the Debt Service Fund, FCSC is already receiving the maximum possible revenue from levies under the state's property-tax caps and all Debt Service Fund revenue is already fully committed to paying debt incurred for construction and leases. Mercer Aff. ¶ 8.[13]

---

[12] This discussion assumes that a school corporation, like FCSC, does not have a Referendum Tax Levy Fund.

[13] Plaintiff did not argue that FCSC should be required to cancel, delay, or otherwise restructure projects or leases funded through its Debt Service Fund in order to give priority to satisfying judgments, and the Court notes that the Seventh Circuit in *Kashani* did not require

17

Because the only available fund from which FCSC may satisfy a judgment in this case is the General Fund, and that fund consists virtually entirely of state-distributed money, this factor weighs against FCSC's financial autonomy from the state.

**Conclusion.** Given that Indiana funds a majority of FCSC's operational and overall budget, that FCSC is unable to raise additional relevant revenues independently of the state, and that the state would be required to increase its appropriations to FCSC to account for a judgment in this case, it is clear that FCSC is not financially autonomous from the state. These factors outweigh FCSC's failure to show the extent of the state's oversight and control over its finances. Therefore, the Court concludes that FCSC is financially integrated with and heavily dependent on the state for it finances and is not financially autonomous.

### General legal status

FCSC argues that it has the general legal status of an agency of the state because:

> The Indiana Supreme Court both in *Bonner* and *Nagy* recognized the exclusive and almost unbridled discretion the State of Indiana, through the General Assembly, has over local schools and the fact that these local schools are now under the almost exclusive direction and control of the State through comprehensive legislation by the General Assembly, comprehensive rulemaking by the Indiana State Board of Education and the State Board of Accounts, and day to day regulation by the Indiana Department of Education and the State Superintendent of Public Instruction.

---

Purdue University to undertake such adjustment to its already committed projects or debts in order to satisfy a judgment in that case. The Court also notes that neither party addressed any authority for FCSC to transfer money to its General Fund from another fund in order to satisfy a judgment. Finally, while FCSC brought up the irrelevancy of liability insurance as a source of money to satisfy a judgment, Plaintiff did not argue that liability insurance was available or should be utilized as a source of money to pay a judgment, or otherwise affects FCSC's ability to assert immunity. Therefore, the Court does not address these issues.

(Brief at 13). We find no such extensive and far-reaching holdings in either *Bonner* or *Nagy*. The Court agrees with Plaintiff that the many Indiana statutes denominating school corporations as non-state entities, see (Response at 3), the Home Rule Act, Ind. Code 20-26-3-1, *et seq.*, and school corporations' independently elected decision makers tend to show that school corporations do not have the legal status in Indiana of being arms or agencies of the state. The only contrary indication on the present motion, namely, the DLGF's substantive review of school corporations' construction projects, does not outweigh the former evidence. Therefore, the Court concludes that the general legal status of FCSC is not as an arm or agency of the state.

## Conclusion

The Court finds that the degree of defendant Franklin Community School Corporation's financial dependence on the state of Indiana substantially outweighs its generally independent legal status in determining the issue of its immunity from suit. The Court concludes that the Eleventh Amendment immunity enjoyed by the state of Indiana extends to Franklin Community School Corporation in this case. Therefore, Franklin Community School Corporation's motion for summary judgment on all of Plaintiff Kevin D. Long's claims against it is **GRANTED**.

**SO ORDERED.**

Date: 09/21/2010

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Takeia R. Johnson
FROST BROWN TODD LLC
tjohnson@fbtlaw.com

Michael Gregory Moore
mmoore8824@aol.com

Anthony W. Overholt
FROST BROWN TODD LLC
aoverholt@fbtlaw.com

Roger A. Young
YOUNG & YOUNG
yfastford4x4@netzero.com